## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1) MATTHEW DRAYON,<br>a/k/a "Ma," a/k/a "Teddy Bear,"<br><br>Defendant | No. 20-CR-10134-DJC |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR RELEASE[1]

Defendant Matthew Drayton, a multi-convicted felon and leader of a multi-kilogram cocaine and cocaine base drug-trafficking organization in the Boston area, moves to revoke the Court's order of detention. *See generally* Docs. 153, 154. The Defendant argues (as he did during a multi-day detention hearing) that pretrial release is warranted because he has steady employment, a stable family structure, good character, and a dated criminal history – all of which the Court expressly took into account when ultimately issuing its order of detention. *See* Doc. 137 at 3. In particular, the Defendant highlights Probation's assessment of a proposed release residence as "suitable as a potential release plan" as grounds undercutting the Court's detention order. Doc. 154 at 2-3, 7. The Defendant, however, fails to note that – notwithstanding its assessment of a residence as "suitable" – Probation maintained its position that the Defendant remain detained pending trial stating, "[t]he Probation Office notes that the recommendation of

---

[1] The government submitted approximately seventeen exhibits in support of detention as well as the testimony of DEA Special Agent Jim Cryan. References to exhibits submitted in support of this response are by exhibit number and page or paragraph, where appropriate, e.g., Exhibit _ at _. The United States assumes the Court has access to the Defendant's criminal history through the pretrial services report.

detention still remains."[2]  Moreover, the Defendant fails to address the overwhelming evidence that the United States presented in support of his detention, which established, *inter alia*, the Defendant's leadership role in the charged drug conspiracy, his involvement in firearm trafficking, his use of force over drug-trafficking affiliates and stash locations, and the involvement of various Drayton family members (including his wife, brother, and sisters) and their respective residences in supporting the Defendant's criminal activities.  And while the Defendant's criminal history concededly is older, it nonetheless reflects an individual whose past mirrors his present charges: drug trafficking.  For the following reasons, this Court should affirm the magistrate judge's determination and deny the Defendant's motion for revocation.

## BACKGROUND

**I.      GROUNDS FOR DETENTION**

Pursuant to the Indictment, a federal grand jury charged the Defendant in Count One of the Indictment with Conspiracy to Distribute and Possess With Intent to Distribute Cocaine and Cocaine Base in violation of 21 U.S.C. § 846.  *See* Dkt. 107.  The United States requested the Defendant's detention under the following statutory grounds:

- 18 U.S.C. § 3142(e)(3), because the Defendant is charged with an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act, which, in turn, establishes a rebuttable presumption that no condition or combination of conditions will reasonably assure the Defendant's appearance and safety of the community;

- 18 U.S.C. § 3142(f)(1)(C), because the Defendant is charged with an offense for which a maximum term of 10 years or more is prescribed in the Controlled Substances Act;

- 18 U.S.C. § 3142(f)(1)(D), because the case involves a felony after the Defendant had been convicted of two or more offenses that would have qualified as Controlled Substance Act or crime of violence offenses under Section 3142(f)(1)(A)-(C);

---

[2] The United States assumes that the Court has access to Probation's memoranda to the Court.

- 18 U.S.C. § 3142(f)(1)(E), because the Defendant is charged with a felony that involves the possession or use of a firearm;

- 18 U.S.C. § 3142(f)(2)(A), because there is a serious risk that the Defendant will not return to Court if released; and

- 18 U.S.C. § 3142(f)(2)(B), because the Defendant presents a serious risk of obstruction of justice or intimidation of a prospective witnesses).

## II.  DETENTION EVIDENCE

The United States submitted approximately seventeen documentary exhibits in support of detention and – though not required by law – the testimony of DEA Special Agent Jim Cryan (upon the Defendant's refusal to proceed by proffer).  *See, e.g., United States v. Acevedo-Ramos*, 755 F.2d 203, 207-08 (1st Cir. 1985) (congressional intent in enacting Bail Reform Act was to allow parties, including government, to proceed by proffer during bail hearings; discretion to require witness testimony from government lies with judge, not with defendant); *see also United States v. Fernia*, No. 92-2324, 1993 WL 5893, at *4 (1st Cir. 1993) ("[A defendant's] objection that a judicial officer may not order detention on the basis of a mere proffer of evidence by the government is simply not correct"); *United States v. Pasciuiti*, No. 92-1112, 1992 WL 51482, at *5  (1st Cir. 1992) ("[D]istrict courts have much discretion in determining whether a bail hearing shall be conducted by proffer or live testimony and have rejected the contention that either the constitution or § 3142(f) necessarily requires that live witnesses be produced at detention hearings."); *United States v. Whitman*, 514 F. Supp. 2d 101, 102 n.1 (D. Me. 2007) (rejecting defendant's position that government could not proceed by proffer at detention hearing and needed a witness as "wrong").

The government summarizes the substance of the submitted evidence (unaddressed by the Defendant in his revocation request) here:

- o **Defendant's Leadership Role and Control Over Fidelis Way**

  - Exhibit 1:  As charged in the Complaint, the Defendant, along with seven co-conspirators (including the Defendant's brother), was the leader of a conspiracy to distribute and possess with intent to distribute cocaine and cocaine base in the Boston area.  Ex. 1.  The Complaint summarized the Defendant's status as a drug supplier for his drug-trafficking organization and set forth evidence, including controlled sales with the Defendant (or his wife), numerous intercepted calls from the Defendant's phone, and corroborating surveillance and/or subsequent arrest seizures confirming the Defendant's drug distribution activities and level of control over his co-conspirators and stash locations.  Ex. 1.

  - Exhibit 2:  The Detention Affidavit provided an overview of the Defendant's leadership role in his drug-trafficking organization and described how the Defendant and his associates, through their drug-trafficking activities, assumed control (through force, intimidation, and harassment) over multiple apartments within the Commonwealth Development in Brighton, Massachusetts ("Fidelis Way") that they operated as stash locations to store, cook, package, and sell their drugs.  *See* Ex. 2, ¶¶ 5-14.

  - Exhibit 8: On a July 2, 2019 intercepted call with his brother, Kenji Drayton, the Defendant offered to resupply drugs to Kenji Drayton but noted that he could not then access his drug supply because Boston Police Department officers were then present at Fidelis Way responding to a call, thereby preventing access to his stash locations.

- o **Defendant's Use of Violence or Force to Maintain Control**

  - Exhibit 3:  The preliminary transcript for a June 23, 2019 call between the Defendant and co-conspirator Arthur Hodges shows the Defendant expressing frustration over other drug dealers' product making its way into Fidelis Way and using violence against his own drug runners when they went against his business model.  Ex. 3 ("Them [Ns], I think they got other twerk, bro.  They getting twerk from someone else, bro; that shit is not the same shit that I got, bro.  That shit is like aggravating me man.").  The Defendant ordered Hodges to make sure that their product – and not another dealer's – was being pushed throughout Fidelis Way.  *Id.* ("Don't get no shit from nowhere else bro cause I'm gonna start checking [Ns'] twerk.").  The Defendant also expressed frustration against "Clock," an identified drug runner within the Defendant-Hodges' drug conspiracy, who had been consuming the Defendant's product instead of selling it.  The Defendant stated that he manifested that frustration by hitting Clock in the head with a hammer.  Ex. 3. ("I just bust Clock in the fucking head with a hammer bro. . . . I just bust him in his fucking head….This [N] said he done smoked it all! [N] smoked everything….").

- o **Defendant's Intended Use of, or Trafficking In, Firearms**

    - Exhibit 4: The preliminary transcript for a July 8, 2019 call between the Defendant and an individual, A.G., shows the Defendant trying to obtain a firearm with a silencer. The Defendant stated, in relevant part: "If you can try to find me one of those ah, like a small nasty, little quiet….With the quiet head on the bitch man…saying just a little bitch that's got a quiet head on her shoulders and shit." Ex. 4. A.G. confirmed he knew someone who was not a felon who could buy what the Defendant needed. The Defendant further explained his need for a firearm with a silencer, stating, "I just feel like something about to come up and shit" and that he had to "be able to" move "real quiet," to which A.G. responded, "even if it gotta get nasty." *Id.*

    - Exhibit 5: The preliminary transcript for an April 16, 2020 call between the Defendant and co-conspirator Kenji Drayton shows that the Defendant's interest in firearms was not limited to the 2018-2019 period of his drug conspiracy. Only two months before his arrest in this case, the Defendant – while inside his sister's residence (S. Drayton, i.e., "Shizzie") – called Kenji Drayton while trying to find two firearms that had been stored there. Kenji Drayton, however, already had sold the firearms and offered to replace them for the Defendant. At one point in the call, the Defendant referenced his wife assisting in finalizing a firearm trafficking deal. Ex. 5 ("Kim about to give him the seven right now….").

- o **Defendant and Brother's Use of 115 Moreland Street for Drug Trafficking**

    - Exhibit 6: A series of intercepted calls on May 4, 2019 describe a drug deal between the Defendant and G.P. During those calls, the Defendant requested and obtained drugs from his brother, Kenji Drayton, then directed G.P. to his residence at 115-117 Moreland Street. He ultimately had his wife, K. Drayton, supply the drugs to G.P. on his behalf. In addition to showing the Defendant's drug distribution activity, the call shows multiple family members' assistance in his drug trafficking, and also, the use of 115-117 Moreland Street as a drug deal situs – the same residence to which the Defendant repeatedly sought pretrial release during the prior detention hearing.

    - Exhibit 7: During various intercepted calls on September 24, 2019, the Defendant's brother, Kenji Drayton, along with co-defendant Hassan Monroe (a co-conspirator charged in a different drug conspiracy involving the Defendant's brother and charged in a separate indictment) discussed the details and logistics of conducting a drug deal. Ultimately, they agreed to "do the four" (which testimony established is drug code for cocaine) at 115 Moreland Street, the Defendant's residence with his wife of 17 years.

- o **Defendant's Connection to 117 Moreland Street**

    - Exhibit 9: The Defendant's driver's license lists his mailing and residential addresses as 117 Moreland Street, Roxbury, Massachusetts.

- Exhibit 10: A website for the Defendant's company, KM&D Home Improvement Services, lists his business address as 117 Moreland Street, the business owner's name as "Matthew Drayton," and the business owner's address as "117 Moreland Street."

- Exhibit 11: A BuildZoom website page for the Defendant's company, KM&D Home Improvement Services, lists his business address as 117 Moreland Street, Roxbury, Massachusetts.

- Exhibit 12: A document generated by T-Mobile U.S.A.'s Law Enforcement Relations Group shows the subscriber information for Defendant's cellphone (the same phone number on which the Defendant was intercepted during the course of this investigation). That subscriber information lists both the Defendant's service address and his billing address as 117 Moreland Street.

- Exhibit 20: The Defendant originally submitted this letter as part of his own detention exhibits. The letter, authored by the Defendant's employer and addressed to the Defendant's attorney, lists the Defendant's identified residence as 117 Moreland Street, Roxbury, Massachusetts.

o **Troubling Evidence Across Various Draytons' Residences**

- Exhibit 13.1-13.16: A search warrant was executed in this case at the residence for one of the Defendant's sisters, S. Drayton. Notably, that residence is the same sister's residence referenced in Exhibit 5 – where the Defendant and his brother discussed the whereabouts of two missing firearms initially stored there. During the search warrant's execution, law enforcement recovered nearly $4,000 in cash stored in a manner consistent with drug proceeds. Also recovered were a number of documents pertaining to the Defendant's mother's estate. Nearly all of the correspondence was addressed to the various Drayton siblings; the Defendant, Kenji Drayton, and their sister P. Drayton, each had 115 Moreland Street listed as their respective residence.

- Exhibit 14.1 – 14.2: The Defendant's sister, P. Drayton, and her brother-in-law resided at 117 Moreland Street. During the search warrant's execution, law enforcement recovered approximately 23 firearms and over 60 rounds of ammunition. One firearm was not secured on the day of the search warrant. The arsenal was a mere wall away from the Defendant's supposed residence at 115 Moreland Street.

- Exhibit 21: The search warrant return for 117 Moreland Street confirmed that the Defendant's sister, P. Drayton, was his immediate neighbor.

- Exhibit 15.1 – 15.17: Law enforcement also executed a search warrant in the basement of 115 Moreland Street, the residence in which the Defendant was arrested. On the day of his arrest, the Defendant denied that he lived at 115 Moreland Street.

6

Immediately outside the doorway entrance to the basement of 115 Moreland Street was an advertisement for the Defendant's KM&D Home Improvement Services that listed his phone number – the same phone number on which law enforcement continuously intercepted the Defendant in this investigation.  Also photographed were a number of identification cards and mail belonging to the Defendant and his wife, K. Drayton.  Two of the Defendant's driver's licenses listed 117 Moreland Street as his residence; one of his wife's driver's licenses listed 117 Moreland Street as her residence, and the other listed 115 Moreland Street as her residence.  The Defendant also had a Massachusetts Department of Transitional Assistance Card that belonged to one of his identified drug runners, D.S.  The Defendant had various correspondence from government or state agencies, which listed his residence as 117 Moreland Street, and a piece of mail from National Grid that listed his residence as 115 Moreland Street.  Lastly, various wads of cash were recovered during the search of 115 Moreland Street's basement.

## **LEGAL STANDARD**

The law mandates a defendant's detention pending trial if, after a hearing, the court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e); *see also United States v. McForbes*, 109 F. Supp. 3d 365, 367 (D. Mass. 2015) (denying defendant's revocation request due to dangerous nature and circumstances of alleged crime and government's significant evidence, despite defendant's showing of significant ties to community and pre-trial services' recommendation of release).[3]  The government bears the burden of demonstrating that a defendant poses a danger to the community by clear and convincing evidence or that the defendant poses a flight risk by a preponderance of the evidence. *See United States v. Rose*, 2012 WL 2500497, *1-2 (D. Mass. June 26, 2012) (affirming

---

[3] As noted by the Senate Judiciary Committee: "This reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community."  S. Rep. No. 98-147, at 39 (1983); *see also United States v. Patriarca,* 948 F.2d 789, 792–793 (1st Cir. 1991).

magistrate judge's detention order where, *inter alia*, a defendant faced lengthy imprisonment term and was the alleged ringleader of drug-trafficking organization).

In determining whether any conditions of release will reasonably assure the defendant's appearance and the safety of any other person and the community, the Court must consider the factors set forth in 18 U.S.C. § 3142(g), which include: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger that the defendant's release would pose to any other person or the community. 18 U.S.C. § 3142(g). Where a defendant seeks review under 18 U.S.C. § 3145(b) of a magistrate judge's detention order, a district court must review that pretrial detention order *de novo*. *United States v. Marquez*, 113 F. Supp. 2d 125, 127 (D. Mass. 2000) (affirming magistrate judge's pretrial detention order where evidence showed defendant's participation in an alleged drug conspiracy).

While a district court may take additional evidence or conduct a new evidentiary hearing when appropriate, "[t]he need for a hearing depends on whether the defendant has placed relevant facts at issue." *United States v. Cidraz-Santiago*, 18 F. Supp. 3d 124, 126 (D.P.R. 2014). That is, if a defendant's submissions "were adequate to raise a disputed factual issue that was necessary to decide his motion," then an evidentiary hearing may be appropriate. *Id.* (quoting *United States v. Alonso*, 832 F. Supp. 503, 504-05 (D.P.R. 1993)). The Defendant declined to address the strength of the government's case and instead focused his argument on the strength of his familial base, employment, and character, submitting several letters with his motion (which the Government does not object to the Court's consideration thereof).

Accordingly, the United States does not believe that a further evidentiary hearing is necessary to assess the Defendant's revocation request.

## ARGUMENT

The factors set forth in 18 U.S.C. § 3142 guide the Court in determining, on a case-by-case basis, whether pretrial release is appropriate. The evidence adduced at the Defendant's detention hearing amply shows that he poses a danger to the community and that no conditions or combination of conditions can adequately address these risks. That evidence bolsters the rebuttable presumption already applicable to the Defendant's case, given that he is charged with a Controlled Substance Act offense for which he is facing a period of at least ten years' imprisonment. *See* 18 U.S.C. § 3142(e)(3). The Defendant's Motion should be denied, and no further evidentiary hearing is required.

**I.     THE DEFENDANT POSES A SERIOUS DANGER TO THE COMMUNITY**

Each and every factor supports the Defendant's detention and demonstrates that no conditions of release can assure the safety of the community.

**A.     NATURE AND CIRCUMSTANCES OF THE CHARGED OFFENSES**

The nature and circumstances of the charged offense are serious: The Defendant was not a mere participant in a multi-kilogram drug conspiracy, but rather, was its leader. *See generally* Exs. 1, 2. With the aid of his brother, the Defendant ensured a steady supply of cocaine and cocaine base into Fidelis Way, the locus of the Defendant's drug-trafficking operations. *See generally* Exs. 1, 2. The Defendant, along with his associates, used force, intimidation, and harassment to overtake various apartments within Fidelis Way, which were then turned into stash locations for purposes of preparing and selling drugs. *See* Ex. 2, ¶¶ 5-14. The Defendant's level of control over Fidelis Way is specifically reflected in Exhibits 3 and 8, the former of which

showed the Defendant's frustrations upon learning that other drug dealers' product was encroaching upon his market, and the latter of which showed the Defendant's omniscience as to the happenings at Fidelis Way (including to law enforcement's presence in the area for unrelated matters). The Defendant's use of violence to maintain control was not limited to stash locations, either. Exhibit 3 showed that he even attacked one of his own drug runners by hitting him in the head with a hammer on learning that the runner had consumed the Defendant's product instead of selling it. And residences associated with the Defendant (Ex. 15.1-15.17, i.e., 115 Moreland Street) or his family members (Ex. 14.1-14.2, i.e., 117 Moreland Street and Ex. 13.1-13.16, i.e., sister's residence) contained items, including thousands of dollars in cash or firearms and ammunition, consistent with his drug-trafficking operations.

Additionally, the evidence shows that while law enforcement's overall investigation into the Defendant shifted to his brother, Kenji Drayton, post August 2019, the Defendant's criminal activity did not end at that time. Rather, Exhibit 5 showed that as of April 2020 (two months before the Defendant's arrest), the Defendant sought his brother's assistance in locating two firearms that had been stored at their sister's residence (a location from which law enforcement recovered cash consistent in quantity and storage with drug proceeds). The call captures both the Defendant's recent dealings in firearms and his wife's assistance in a firearm transaction – two notable points, given the Defendant's efforts to distance himself and his wife from 117 Moreland Street, the other half of his deceased mother's two-family structure wherein over 20 firearms and 60 rounds of ammunition were recovered on the date of the Defendant's arrest.

Moreover, as addressed *infra*, Exhibit 5 is not the only intercepted call showing the Defendant's zeal for firearms. *See generally* Ex. 4; *see also United States v. Green*, 887 F.2d 25, 27 (1st Cir. 1989) (firearms are "tools of the trade" in drug trafficking); *United States v. Hinds*,

856 F.2d 438, 443 (1st Cir. 1988) (narcotics dealing and guns go "hand in hand"). Indeed, Exhibit 4 alone speaks to the Defendant's dangerousness to the community and need for detention pending trial, as he seeks out a firearm with a silencer so as to be able to move "real quiet" should problems arise, even if – as his call colleague notes– "it gotta get nasty." Ex. 4.

As a result of the pending offense, the Defendant faces a considerable sentence if convicted. Based on current estimated drug quantities attributable to the Defendant, the Defendant's offense level, at a minimum, is 34. *See* U.S.S.G. § 2D1.1. Furthermore, likely adjustments based upon leadership and possession of firearms would raise the offense level by six. Thus, regardless of the Defendant's criminal history, the guideline sentencing range (when estimated most conservatively in terms of drug weight and criminal history) would be 151-188 months – and likely greater than that, given the evidence presented at the detention hearing.

### B. WEIGHT OF THE EVIDENCE

The weight of the evidence against the Defendant is overwhelming. Initial discovery productions in the case (which predated the indictment's issuance and occurred over three months ago) involved the production of over 16,000 pages of searchable linesheets capturing the substance of recorded conversations regarding two separate but complementary drug conspiracies involving the Drayton brothers. Although the wire investigation spanned the course of a 13-month period, the wire investigation as to the Defendant targeted the period of May 2019 to late August 2019, and the overall investigation into the Defendant occurred over a near ten-month period. Calls involving the Defendant occurred over the same telephone number that he routinely advertised as his own. *See* Exs. 12, 15.3, 15.5. The numerous recordings alone establish the Defendant's leadership role within his drug-trafficking operation and active participation in a cocaine and cocaine base conspiracy.

Investigators successfully corroborated the Defendant's numerous intercepted calls with a number of audio or video-recorded controlled buys with the Defendant or his associates, which predated the wire investigation.  At least five of those controlled buys occurred directly with the Defendant.  Investigators also corroborated the wire recordings through surveillance and wall-off stops and seizures, further confirming the Defendant's drug-dealing activities and his brother, Kenji Drayton, as a key source of supply.  *See generally* Ex. 1.  Law enforcement's surveillance commonly observed the Defendant meeting with individuals, traveling to particular locations, and/or taking certain actions consistent with what he had previously discussed on intercepted calls. *See generally* Ex. 1.  The wall-off stops and seizures further confirmed the nature and quantities of drugs that the Defendant typically distributed.  Additionally, law enforcement officers executed a number of search warrants during their investigation, including at residences associated with the Defendant, his family members, and/or his associates, and recovered contraband (e.g., drugs, drug proceeds, and/or firearms or ammunition) consistent with the Defendant's drug-trafficking business.

While the weight of the evidence from the complaint, detention affidavit, and detention exhibits previews the strength of the Government's case against the Defendant, they are merely the tip of the evidentiary iceberg against the Defendant.

### C. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

While admittedly older, the Defendant's criminal history nonetheless includes a number of arrests and prior criminal convictions reflecting a theme of drug-trafficking.  His convictions include:

- Roxbury District Court, Possession to Distribute (Class B), Operating Recklessly, Resisting Arrest, Docket No. 0802CR002344N, sentenced in December 2008 to two years, suspended until 2010.  Two violation notices issued.

- Roxbury District Court, Firearm Identification Card, Docket No. 0402CR3321, continued without a finding in February 2006 until August 2006; dismissed.

- Brighton District Court, Distribute/Dispense Class B, Docket No. 0008CR0479, sentenced in October 2000 to probation until October 2002. Three violation notices issued; in August 2002, violated probation and probation was terminated.

As the Defendant notes in his motion for revocation, his history of weapons use involves charges from his juvenile years and from 2003 for assault-and-battery with a dangerous weapon. Defense counsel asks the Court to disregard such "ancient cases" "in determining whether . . . appropriate conditions of release" may be fashioned in 2020. Doc. 154 at 5. While the Government concedes those charges are older in date, Exhibits 4 and 5 make clear that the Defendant's "history of weapons use" is not a thing of the past, but very much a part of his present. *See* Exs. 4, 5. And Exhibits 1 through 4 each show that the Defendant's use of force, intimidation, or violence to assert or maintain dominance are not the untamed or immature bygones of his juvenile years. *See* Exs. 1-4.

Furthermore, the Defendant submits character attestations from family members or friends, which are typically useful, as they can identify a source of support or even supervision. However, that is not the case here. As the evidence submitted at his detention hearing showed, the Defendant's family members were aware of – and at times, even furthered – his criminal activities. In sum, the Defendant was one of two Drayton brothers charged in this case (Ex. 1); the Defendant's wife aided in his drug and firearm trafficking activities (Exs. 1, 5, 6); his sister, S. Drayton, had suspected drug proceeds stored at her residence and appeared to house firearms there for her brothers (Exs. 5, 13.1-13.16); and another sister, P. Drayton, lived next to the Defendant with an arsenal of weaponry (Exs. 14.1-14.2; 21).

Indeed, as to 117 Moreland Street, the Defendant continues to assert (as he did during the prior hearing) that law enforcement's recovery of 23 firearms and over 60 rounds of ammunition

13

from the address bears no connection to him, stating that the potential contraband simply belonged to a "Merrick Rembert, a resident" at that address. Doc. 154 at 5-6. The Defendant, however, initially sought release to 115 Moreland Street – the residence immediately adjacent to 117 Moreland Street. In fact, both 115 and 117 Moreland Street are two halves of the same family structure owned by the Drayton family. *See* Ex. 14.1. "Merrick Rembert" was more than a mere resident at 117 Moreland; he is the Defendant's brother-in-law, who resided (along with one of the Defendant's sisters) next door to the Defendant. The evidence (including one of the Defendant's initial detention exhibits) showed that the Defendant alternated between identifying 115 or 117 Moreland Street as his residence in personal or business dealings (including to state, government, or public entities), more often than not identifying 117 Moreland Street as his address. *See* Exs. 9, 10, 11, 12, 15.8, 15.10, 15.11, 20. Even if there is a dispute as to technical ownership of the firearms within 117 Moreland Street, the evidence shows that all such firearms and ammunition were found within a residence that the Defendant consistently identified as his own. Lastly, the evidence showed that the Defendant did at least five controlled sales from 115 Moreland Street's basement; that his brother, Kenji Drayton, did at least one drug deal at that same location, Ex. 7; and, as established via testimony at the detention hearing, that the Defendant informed law enforcement when arrested at 115 Moreland Street that he did not live there. All of these factors – including the Defendant's continued denial of any connection to 117 Moreland Street, Doc. 154 at 5-6 – speak to the Defendant's lack of supervisability.

The Defendant's proposal of a different residence does not allay these concerns, either. Regardless of location, the Defendant likely would have the same access to firearms – through his brother-in-law or another person. It is telling that Probation, while it found the new residence acceptable *if released*, continues to recommend detention.

**D.     NATURE AND SERIOUSNESS OF DANGER POSED BY RELEASE**

The Defendant claims that "[f]rankly, [he] is the kind of defendant in this Court who should be released pending trial." Doc. 154 at 7. The evidence belies any such claims.

The Defendant, a convicted felon with probation violations, was the leader of a multi-kilogram drug conspiracy who actively used force to establish control over both associates and stash locations; sought out firearms for trafficking or intended use purposes; and who enlisted (and continues to enlist) the assistance of family members to aid in his activities and objectives. The Defendant's criminal history – while older – shows the continued presence of drug trafficking in his life (including that of several family members). And the Defendant troublingly continues to deny any connection to a residence that – outside of this proceeding – he otherwise routinely identifies as his own (whether to phone companies, business web sites, or to state entities) and in which his own family members live (a point he fails to so much as acknowledge). The arguments the Defendant raises to counter his dangerousness gloss over the cold reality that, if released, he would live alongside individuals (like his wife) who aided his criminal activities while presumably holding the same employment he previously had while leading the underlying drug conspiracy.

For all of these reasons, this Court should affirm the magistrate judge's determination that no conditions of release may be fashioned to address the Defendant's dangerousness to the community.

## **CONCLUSION**

The Defendant presents a significant danger to the community. Because no conditions can assure the safety of the community, this Court should uphold the magistrate judge's determination that detention is warranted.

                        Respectfully submitted,

                        ANDREW E. LELLING
                        United States Attorney

By:   */s/ Kaitlin R. O'Donnell*
        Kaitlin R. O'Donnell
        Timothy E. Moran
        Assistant U.S. Attorney
        United States Attorney's Office
        1 Courthouse Way, Suite 9200
        Boston MA 02210
        617-748-3645

CERTIFICATE OF SERVICE

       I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                           */s/ Kaitlin R. O'Donnell*
                                           Kaitlin R. O'Donnell
                                           Assistant U.S. Attorney

Date: October 8, 2020