## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                          )
**UNITED STATES OF AMERICA**              )
                                          )
                                          )
                                          )
         **v.**                           )         **Criminal No. 20-10134-DJC**
                                          )
**MATTHEW DRAYTON,**                      )
                                          )
         **Defendant.**                   )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                              **November 6, 2020**

### Introduction

Upon the motion of Defendant Matthew Drayton ("Drayton") to revoke the Detention Order, entered on August 14, 2020, D. 137, the Court has made an independent, *de novo* review, see United States v. Pierce, 107 F. Supp. 2d 126, 128 (D. Mass. 2000); United States v. Tortora, 922 F.2d 880, 883 n.4 (1st Cir. 1990), of the record and counsel's arguments.  For the reasons stated below, the Court DENIES the motion to revoke Detention Order, D. 153, and the Detention Order, D. 137, shall remain in place.

In entering the Detention Order, the Court (Bowler, M.J.) concluded that no condition or combination of conditions would reasonably assure the safety of any other person and the community.  D. 137 at 2.  Although the Court applied the rebuttable presumption that no condition or conditions would reasonably assure such safety given that there is probable cause to believe that Drayton committed the crime of drug trafficking conspiracy charged here, the Court concluded that Drayton had presented sufficient evidence to rebut that presumption, but even so, based upon the balance of relevant considerations, detention was still warranted. D. 137 at 2.   Accordingly,

1

upon review, this Court must determine whether there has been a showing, upon clear and convincing evidence, that no condition or combination of conditions will reasonably assure the safety of any other person and the community.  18 U.S.C. § 3142(e); United States v. DiGiacomo, 746 F. Supp. 1176, 1180-81 (D. Mass. 1980).  In determining whether there are conditions of release that will reasonably assure such safety as required, the Court must consider the factors under 18 U.S.C. § 3142(g) including the nature and circumstances of the offenses charged, including whether the offense is a crime of violence; the weight of the evidence; the history and characteristics of the defendant; and the nature and seriousness of the danger that the defendant's release would pose.  The Court addresses these factors in the discussion below.

## Discussion

As to the nature and circumstances of the criminal offenses charged against Drayton, the Court has considered the following.  The indictment charges Drayton and seven other individuals with conspiracy to distribute and possess with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. § 846. D. 107.  These charges arise out of a 20-month long investigation between November 2018 and June 2020 regarding the drug distribution activities led by Drayton and co-defendant Arthur Hodges and their co-conspirators in and around the Fidelis Way housing development.  D. 14 at 2-3.  The investigation included, but was not limited to, controlled purchases of drugs, including at least five of which were from Drayton, D. 162 at 12, interception of wire and/or electronic interceptions of several telephones, including Drayton's, and physical surveillance.  D. 4-1 at 5-6.  Intercepts of Drayton's telephone (and subsequent surveillance) revealed that Kenji Drayton, Drayton's brother and co-defendant, was a source of supply of drugs for Drayton.  D. 4-1 at 10-11 (Drayton's calls with Kenji Drayton and then delivery to "G.P." whom police subsequently stop and seize approximately seven grams of cocaine base).  There are

numerous discussions (in coded language) about Drayton getting a supply of drugs from Kenji Drayton.  D. 4-1 at 12-16.  Drayton was also intercepted speaking with Hodges about their drugs as compared to the drugs offered by other suppliers, D. 4-1 at 18-19, and Drayton expressed concern about having any of his drug runners or distributors selling drugs other than those he supplied.  D. 4-1 at 19-20; Exh. 3[1] (line sheet of Drayton/Hodges call about "Clock").  Drayton's intercepted communications with other co-defendants also concerned drug trafficking.  For one example, in a series of conversations (in coded language) between Drayton and co-defendant, Jean Aman, they arranged meetings for the exchange of drugs.  D. 4-1 at 36-39.  After one of these exchanges of calls, police stopped Aman in a vehicle while en route to meet Drayton.  D. 4-1 at 40.  During this stop, officers recovered approximately 62 grams of cocaine from Aman's person.  D. 4-1 at 40.  A search of Aman's residence later that evening resulted in the seizure of approximately 600 grams of cocaine, firearm magazines and rounds of assorted ammunition.  D. 4-1 at 41.  Based upon the evidence presented at the detention hearing, D. 137 at 3; D. 145, agents and officers seized approximately 1.7 kilograms of cocaine and cocaine base and $200,000 in cash during the investigation of this alleged conspiracy.  D. 14 at 3.

Although as the defense points out, Drayton is charged here with a single, non-violent offense, D. 163, the conspiracy charged extended over a long period of time involving the distribution of significant quantities of illegal drugs.  Moreover, even as the crime itself is not a violent crime, there is other evidence suggesting Drayton's willingness to resort to violence to advance or protect his drug trafficking operation.  First, there is the intercepted call between Drayton and Hodges in which Drayton is complaining about his drug runners selling drugs supplied by others.  Drayton does not dispute that his comment that he would "just bust Clock in

---

[1] All exhibits referenced are to exhibits admitted during the detention hearing.

the fucking head with a hammer bro," Exh. 3, refers to "Clock" (Daryl Smith) believed by law enforcement agents to be one of his drug runners. That Drayton has offered an affidavit from Smith disavowing a claim that "Drayton struck me in the head with a hammer" as "[t]hat never happened" is not particularly compelling to this Court given the limits of this disavowal (i.e., that Drayton did not strike him with a hammer on that occasion) and the alleged work relationship between the two. See Exh. 3; D. 15.8 (showing Daryl Smith's DTA card found in Drayton's residence). As to the specific use of firearms as 'tools of the trade' in the drug trafficking organization, there is also an intercepted call involving Drayton where a reasonable interpretation of the discussion indicates his interest in getting a firearm with a silencer (i.e., "[w]ith the quiet head on the bitch man"), his recognition that another individual who "ain't no felon" could do so and that it would allow Drayton to move "[r]eal quiet." Exh. 4. Neither intercepted statement by Drayton, particularly in the shadow of his criminal history (including drug distribution convictions) and the seizure of more than twenty firearms and over sixty rounds of ammunition from 117 Moreland Street, Exh. 21; D. 162 at 13, an adjacent residence with which Drayton remains closely connected, counter the showing of Drayton's willingness to resort to violence, particularly in protection or advancement of his drug trafficking operation.

In connection with the arrests in this case, law enforcement agents executed search warrants on various locations, including 115 Moreland Street in Roxbury (where Drayton currently resides) and 117 Moreland Street in Roxbury (where Drayton previously resided and where his sister's family remains and where the firearms were discovered). The two addresses are side by side, part of the same residential, multiple family structure. Exh. 14.1. Although Drayton, his wife and children have lived at 115 Moreland Street for the past ten years, D. 154 at 6, he previously lived at 117 Moreland Street. The defense has produced a deed to this property and

structure showing that it has been in Drayton's family for years.  Exhs. E, F.  The Court recognizes that no firearms were found at Drayton's current residence, D. 163; Exhs. 15.1-15.17, and that the government has not asserted any charges against Drayton (or anyone else) for the possession of of the firearms at 117 Moreland Street.  Still, Drayton's connection to this residence remains a factor for the Court to consider here where the 117 Moreland Street address remains in the possession of a family member, Drayton continues to list the address as his residence on numerous personal and business documents, Exhs. 9-12, including some found in his current residence, Exh. 15. 11, and his residence remains in the same, adjoining structure.

In light of these facts and circumstances, the Court concludes that the weight of the evidence against Drayton is strong and, although he is charged with a serious, but non-violent crime, the record, at a minimum, reflects Drayton's willingness to engage violence and procure at least one firearm (with silencer) illegally (as a 'straw purchase' of a firearm by a convicted felon would be) in the operation of same.  Moreover, given his criminal history and alleged leadership role, he is facing a substantial sentence if convicted (i.e., the government estimates his GSR to be 151-188 months, D. 162 at 11).

The Court has also considered Drayton's personal history and characteristics.  He is now 43 years old and is a lifelong resident of Boston. D. 154 at 4.  Drayton has been married for 17 years and has three children.  Id.  He graduated from high school and has worked as a maintenance technician since February 2014.  Exh. 20.  Although he points to the age of his criminal history, the Court has considered that fact along with the fact that this record involves prior convictions for drug trafficking and probation violations as to same.  D. 162 at 15.  The Court also notes that Drayton continues to have family and community supports given the letters of support that the Court received, including two from fellow inmates.  D. 154-1 to 154-6.  Without diminishing what

Drayton means to his family or to the younger inmates to whom he has provided counsel, family support in this cases is a less compelling basis for release than it would perhaps be in other cases where Drayton's brother, Kenji Drayton is a co-defendant, law enforcement believes that one of his brother's intercepted calls refers to having retrieved a bag with two firearms from the residence of one sister, Shanette Drayton, and another call between the brothers make reference to Drayton's wife, Kim, helping to facilitate a subsequent transaction, Exh. 5, and the adjacent residence of 117 Moreland Street where the firearms and ammunition were found is the residence of another of Drayton's sisters and his brother-in-law.  Perhaps in recognition of these allegations and the centrality of 115-117 Moreland Street to the government's case, Drayton proposes a release plan that involves staying with a longtime friend in another residence.  <u>See</u> PTS Supplemental Memorandum, 8/3/20.  Although this residence may have been an acceptable placement to Probation, and even as the Court has considereed Drayton's motion against the impact of COVID-19 as the defense urges the Court to do, the Court concludes, after a *de novo* review of the record here and based upon a consideration of the balance of these factors under Section 3142(g) as discussed above, that there is no condition or combination of conditions that would reasonably assure the safety of others and the community.

<u>**Conclusion**</u>

Accordingly, the Court DENIES the appeal of the Detention Order, D. 153, and that Detention Order, D. 137, shall remain in place pending trial.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge